IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RALPH JUNIOR BUSH,        )
                             )
         Plaintiff,         )
                             )
     v.                    )      CIVIL ACT. NO. 2:13-cv-50-CSC
                             )               (WO)
CAROLYN W. COLVIN,       )
Acting Commissioner of Social Security,    )
                             )
        Defendant.        )

## MEMORANDUM OPINION AND ORDER

### I. Introduction

On November 11, 2008, the plaintiff, Ralph Junior Bush, protectively filed a Title II application for a period of disability and disability insurance benefits. (R. 31, 194). Bush alleges disability beginning January 9, 2006. (R. 31, 46). After the claims were initially denied, Bush requested and received a hearing before an administrative law judge ("ALJ"). (R. 42,80). Subsequently, on November 23, 2010, ALJ Tracy S. Guice denied the claim. (R. 41). On December 19, 2012, the Appeals Council rejected a subsequent request for review. (R. 1). The ALJ's decision consequently became the final decision of the Commissioner of Social Security ("Commissioner").[1] *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The case is now before the court for review pursuant to 42 U.S.C. §§ 405 (g) and 1383(c)(3). Pursuant to 28 U.S.C. § 636(c), the parties have consented to entry of final

---

[1] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub. L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

judgment by the United States Magistrate Judge.  Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner should be reversed and remanded with instructions that benefits be awarded.

## II.  Standard of Review

Under 42 U.S.C. § 423(d)(1)(A) a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .

To make this determination[2] the Commissioner employs a five-step, sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the claimant presently unemployed?
> (2) Is the claimant's impairment severe?
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the claimant unable to perform his or her former occupation?
> (5) Is the claimant unable to perform any other work within the economy?

> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[3]

---

[2] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 20 CFR §§ 404.1508; 20 CFR § 416.908.

[3] *McDaniel v. Bowen,* 800 F.2d 1026 (11th Cir. 1986) is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits.  *See Sullivan v. Zebley*, 493 U.S. 521, 525 n.3

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record which supports the decision of the ALJ, but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

### III. The Issues

**A. Introduction.** Bush was born on May 22, 1962. (R. 194). He was 48 years old on the date the ALJ issued an opinion in this case. (R. 31). His ability to read, write, add, and subtract is extremely limited. (R. 47, 86, 87). He did not finish high school, where he was enrolled in special education classes. (R. 47). His past employment history includes work as a tractor operator, farm laborer, and plasterer helper. (R. 63, 69). Bush alleges that

---

(1990). Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See, e.g., Sullivan*, 493 U.S. at 525 n.3; *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

he is disabled due to intellectual disability, chronic pain syndrome associated with traumatic right ankle fusion and degenerative joint disease, right knee radiculopathy, lumbar radiculopathy, hypertension, chronic obstructive pulmonary disease, and arthritis.  (R. 33).

**B.      The Findings of the ALJ**

The ALJ found that Bush met the insured status requirements of the Social Security Act through December 31, 2010.  (R. 33).  Further, the ALJ found that Bush had the following severe impairments:

> borderline intellectual functioning; chronic pain syndrome associated with a history of traumatic right ankle fusion and degenerative joint disease; 1ight knee radiculopathy; lumbar radiculopathy; hypertension; chronic obstructive pulmonary disease; history of alcohol abuse, not material and arthritis.

(R. 33).

The ALJ concluded that Bush does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 33-34).

The ALJ determined that Bush

> has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). He is able to lift and carry 10 pounds occasionally and 20 pounds frequently. During an 8-hour workday she can sit for a total of 8 hours and stand/walk for a total of 2 hours; continuously use the upper extremities for pushing and pulling of controls; occasionally use the right lower extremity for pushing and pulling of controls; continuously use the left lower extremity for pushing and pulling of controls; occasionally bend, stoop, kneel, and climb ramps and stairs; frequently balance; precluded from crouching, crawling and climbing ladders, ropes and scaffolds; continuous reach (overhead and in all directions), handle, finger and feel; precluded from exposure to extreme heat, cold, humidity and wetness; precluded from exposure to pulmonary irritants;

no work around unprotected heights or dangerous machinery; able to perform simple routine tasks involving no more than simple, short instructions and simple work-related decisions with few work place changes; no[t] require[d] to read or write reports or perform math calculations; and able to sustain concentration and attention for 2 hours.

(R. 35).

The ALJ found that Bush "is unable to perform any past relevant work," but that, considering Bush's age, education, work experience, and residual functional capacity, "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (R. 39-40). Accordingly, the ALJ determined that Bush is not disabled. (R. 41).

## C.   Issues.

Bush presents the following issues for review:

1.   Whether the ALJ erred as a matter of law by failing to properly evaluate Bush's borderline intellectual functioning as a listed impairment pursuant to 20 C.F.R. part 404, Subpart P, Appendix 1 § 12.05C;

2.   Whether the ALJ erred as a matter of law by failing to state specific reasons constituting good cause for disregarding the medical opinions of Dr. George and Dr. Eno; and

3.   Whether the testimony of the vocational expert is insufficient to constitute substantial evidence to support the findings of the ALJ.

(Doc. 13 p. 1).

Because the court finds that the ALJ erred as a matter of law by failing to follow the correct legal standards in evaluating whether Bush's intellectual impairment met the listing in 20 C.F.R. part 404, Subpart P, Appendix 1 § 12.05C, the court pretermits discussion of the remaining issues presented by Bush.

5

## IV.  Discussion

20 C.F.R. part 404, Subpart P, Appendix 1 § 12.05C provides:

12.05 Intellectual disability[4]: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . . .

C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. part 404, Subpart P, app. 1 § 12.05C.

In this case, the ALJ found that the requirements of paragraph 12.05(C)

are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. Although the claimant's Full Scale IQ score was 68 on the WAIS-IV, Drs. George and DeFrancisco were each of the opinion that this was not an accurate reflection of the claimant's intellectual abilities.  That is, each opined that the claimant functioned in the borderline range of intellectual functioning. Therefore, this score was not felt to be valid.

(R. 34).

Dr. Robert A. DeFrancisco offered no opinion on whether Bush's full-scale IQ score

was an accurate reflection of his intellectual abilities.  In fact, Dr. DeFrancisco's consultative

---

4["The 2013 version of the Listing of Impairments replaced the term 'Mental Retardation' with 'Intellectual Disability.'" *T.R.C. ex rel. v. Comm'r*, --- Fed.Appx. ----, 2014 WL 292286 at *3 n.2 (11th Cir. 2014).]

evaluation was completed on April 8, 2009, over one year before Dr. George administered the IQ test in July, 2010. (R. 287, 346). Dr. DeFrancisco concluded that it was his "best guess" that Bush had borderline intelligence "though we need a WAIS-III to confirm." (R. 290). Accordingly, no evidence supports the ALJ's determination that Dr. DeFrancisco felt that Bush's IQ scores were inaccurate or invalid. (R. 34).

Dr. Fred George, Ph.D., administered the Weschler Adult Intelligence Scale-IV and stated that Bush's "[i]nterest during the testing, motivation, attention, concentration, and persistence were good and the testing is likely a realistic estimate of his intellectual and academic functioning." (R. 347). Bush's Full Scale IQ score was 68. His composite scores were as follows: verbal comprehension, 66; perceptual reasoning, 88; working memory, 74; processing speed, 59. Dr. George noted that "Bush's intellectual testing indicates that his fund of information about the environment is limited, but consistent with his overall intellectual functioning that fell in the high end of the mildly retarded range of functioning. His verbal conceptual thinking is also significantly limited based on his intellectual testing." (R. 347). Dr. George also noted that Bush "has a highly significant strength in his Perceptual Reasoning which falls in the low average range. . . . He has significant weaknesses in tasks involving Processing Speed, both visual motor speed and one requiring visual discrimination." (R. 347).

Dr. George concluded that Bush's Full Scale IQ score of 68 "falls at the 2nd percentile of the Standardization Sample and in the mildly retarded range of functioning." (R. 347).

However, Dr. George diagnosed Bush with borderline intellectual functioning rather than mental retardation and provided the following explanation:

> Mr. Bush was cooperative and the evaluation [is] likely valid. Mr. Bush's overall intellectual functioning falls in the mildly retarded range[.] [T]his is likely not an accurate reflection of his intellectual abilities. His perceptual reasoning falls in the low average range while his processing score falls in the middle of the mildly retarded range and is likely a significant weakness for him bringing his overall IQ score into the mildly retarded range of functioning. In addition, his previous occupational functioning suggests borderline [i]ntellectual functioning.

(R. 348).

Dr. George clearly stated that Bush was "cooperative," the test results were "likely valid," (R. 348) Bush's "[i]nterest during the testing, motivation, attention, concentration, and persistence were good[,] and the testing is likely a realistic estimate of his intellectual and academic functioning" (R. 347). Therefore, the evidence does not support the ALJ's finding that Dr. George "felt" that Bush's full scale IQ score, which fell in the mildly retarded range, was "not . . . valid." (R. 34). *See Walker*, 826 F.2d at 999 (holding that the ALJ's factual findings must be supported by substantial evidence).

The ALJ also concluded, without citing any supporting evidence, the Bush did not have a valid verbal or performance score of 60 through 70. (R. 34). *See* § 12.05(C) (requiring a valid verbal, performance, *or* full scale IQ score). Although, unlike the WAIS-III, the WAIS-IV IQ test does not yield three scores consisting of verbal, performance, and full scale IQ scores, the regulations provide that, "[i]n cases where more than one IQ is customarily derived from the test administered, *e.g.*, where verbal, performance, and full

8

scale IQs are provided in the Wechsler series," the ALJ must "use the lowest of these in conjunction with 12.05." 20 C.F.R. part 404, Subpart P, app. 1§ 12.00(D)(6)(c); *see also*; *Siron*, 2014 WL 595287 at * 2 (11th Cir. Feb. 18, 2014) (holding that, "[a]lthough an ALJ may reject the lowest IQ score," where the evidence indicates that the lowest score is not credible, the ALJ's decision to reject the lower score must be supported by substantial evidence). In this case, Bush's verbal comprehension score of 66 and processing speed score of 59 were clearly considered valid by Dr. George, and nothing in his report or the record as a whole indicates that they are inconsistent with Bush's developmental history and degree of functional limitation. Thus, the ALJ misapplied the regulations in determining that Bush did not meet the requirements of § 12.05(C) merely because she did not consider his *full scale* IQ score to be valid, while failing to consider his valid component IQ scores. *See Wilbon v. Comm'r of Soc. Sec.*, 181 Fed. Appx. 826, 828-29 (11th Cir. 2006) ("Where a series of IQ scores customarily are generated by a single test administration, the regulations require that the lowest of those scores be used in conjunction with Listing 12.05."); *Ambers v. Heckler*, 736 F.2d 1467, 1470 (11th Cir. 1984) (holding that the ALJ misapplies the regulations by failing to consider the lowest score when multiple-score tests such as the W.A.I.S. are administered).

The Commissioner argues that the ALJ's decision to reject Bush's IQ score is nevertheless substantially supported by the fact that, despite recognizing the validity of Bush's IQ scores, Dr. George ultimately concluded that Bush's "overall intellectual

functioning in the mildly retarded range" was "likely not an accurate reflection of [Bush's]

intellectual abilities," and instead diagnosed borderline intellectual functioning.  (R. 348).

However, § 12.05(C) does not require a *diagnosis* of mental retardation; rather, it requires

a "valid verbal, performance, or full scale IQ of 60 through 70."  Dr. George did not reach

his diagnosis because of any inaccuracy in the IQ score itself; he considered the full scale

score to be "valid," "realistic," and consistent with Bush's fund of information about the

environment.  (R. 347-48).  Instead, Dr. George primarily based his diagnosis on Bush's

relatively "highly significant strength in perceptual reasoning" (R. 347-48), as reflected by

a component perceptual reasoning score in the low average range, as well as Bush's

occupational history.[5]  (R. 347-48).  Although Dr. George's professional expertise justified

his significant consideration of Bush's relatively high perceptual reasoning score in reaching

his overall diagnosis, the regulations do not permit rejection of a valid full scale IQ score in

the 60-70 range on grounds that a claimant's perceptual reasoning score was higher than his

other scores.  *See* § 12.00(D)(6)(c); § 12.05(C); *see also Siron*, 2014 WL 595287 at * 2

(holding that, because the ALJ is required to use the lowest score on a single IQ test, the ALJ

---

[5]Contrary to the arguments of the Commissioner, neither the ALJ nor Dr. George discredited Bush's IQ scores on the basis of his work history, and Bush is not precluded from satisfying § 12.05(C) merely because he was previously employed as a tractor operator, farm worker, and plasterer helper.  *Ambers*, 736 F.2d at 1469 (citing with approval cases holding that claimants with the requisite valid IQ scores met the listings despite previously holding jobs such as taxicab driver, coal miner, machine operator, forklift operator, and general laborer).  The Commissioner also argues that Dr. George concluded Bush had the emotional ability to relate to coworkers and the general public and the intellectual ability to perform unskilled, semi-skilled, and some skilled occupations.  However, neither the ALJ nor Dr. George discredited Bush's IQ scores on the basis of Dr. George's conclusions about Bush's residual functional capacity.  Residual functional capacity is irrelevant where the claimant presents a valid IQ score and meets the other requirements of § 12.05(C).  *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992); *Ambers*, 736 F.2d at 1469.

erred in "credit[ing] the claimant's perceptual reasoning index (PRI) of 73 over her full scale IQ of 59").   Therefore, in relying on Dr. George's diagnosis of borderline intellectual functioning to discredit Bush's valid full scale IQ score, the ALJ failed to follow the proper legal standards.

The commissioner argues that, even if Bush's IQ score is valid and credible, *Lowery v. Sullivan*, 979 F.2d 835 (11th Cir. 1992), and *Popp v. Heckler*, 779 F.2d 1497 (11th Cir. 1986), permit the ALJ to reject that score on grounds that, in light of Dr. George's report and other evidence in the record, the ALJ concluded that Bush was not mentally retarded. However, as an examination of *Lowery* and *Popp* makes clear, in neither of those cases did the Eleventh Circuit hold (as the Commissioner suggests here) that an ALJ may reject a valid, credible I.Q. score.  Instead, both cases confirm that, in determining whether the claimant satisfies § 12.05(C), the ALJ *may not* refuse to recognize a valid IQ score, and that any decision to disregard an IQ score on grounds that the claimant is not mentally retarded must be supported by substantial evidence that the score itself was not valid or credible.  *See Siron*, 2014 WL 595287 at * 2 (citing *Popp* in holding that "the evidence presented in cases where we affirmed an ALJ's rejection of an IQ score overwhelmingly indicated that the claimant was not mentally retarded and likely attempted to tailor results [of the IQ test] to effect a desired outcome").

In *Lowery*, the court expressly recognized that, "[a]lthough the ALJ is allowed some leeway to evaluate other evidence when determining the validity of an I.Q. score, an ALJ

may not consider" other evidence, such as "a claimant's age, education, and work experience after the ALJ accepts the I.Q. score as valid and finds that the claimant meets or equals the criteria of a listed impairment." 979 F.2d at 837. As the Commissioner points out, in *Lowery*, citing *Popp*, the Eleventh Circuit stated that it "has recognized that a valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior." 979 F.2d at 837. That statement in *Lowery* is dicta insofar as it may refer to rejection of a "valid IQ score" in determining whether the claimant meets the test score requirements of § 12.05(C). In *Lowery*, the validity of the claimant's full scale IQ score was uncontested; thus, the court accepted the IQ score as credible and presumed that it satisfied the requirements of § 12.05(C). 979 F.2d at 838. The "sole issue" in *Lowery* was whether, despite having a valid IQ score of 69, other evidence such as the claimant's daily activities, behavior, work history, and educational records demonstrated that the claimant failed to satisfy the opening paragraph of § 12.05, which requires that the claimant's mental impairment must manifest itself before age 22. *Id*. at 836, 838-39.

In *Popp*, the Eleventh Circuit held that an ALJ may disregard an IQ score where the record contains substantial evidence that the score is not credible in the first place. *Popp*, 779 F.2d at 1499 ("It is clear that [the claimaint's] performance IQ of 69, if believed, should be the IQ score used in applying Listing 12.05(C) . . . The issue to be resolved by this court is whether the ALJ may find the results of an IQ test to be incredible so that Listing 12.05

is not satisfied, and . . . whether the ALJ was justified in disregarding the test results in this case.").  The evidence in *Popp* demonstrated that the claimant "embellished his answers," exaggerated his symptoms, and "was close to completing the requirements for a bachelor of science degree and had a history of having taught high school algebra;" further, the reports of medical doctors and psychiatrists called the claimant's credibility into question. 779 F.2d at 1499-1500.  Thus, in *Popp*, the evidence supported the ALJ's rejection of the claimant's full scale IQ score of 69 on grounds that "the results of the IQ test were incredible because they were inconsistent with other evidence and because there was good reason to believe that [the claimant] exaggerated his problems."  *Id*. at 1500; *see also Siron*, 2014 WL 595287 at * 2 (stating that, in *Popp*, the evidence supported the ALJ's rejection of a 69 IQ score on grounds that the score was likely the result of manipulation by a claimant who was not mentally retarded).

Here, unlike in *Popp*, the uncontradicted evidence establishes that the test results were credible and that Bush did not exaggerate his problems or attempt to manipulate the outcome of the test.  According to Dr. George, Bush's "[i]nterest during the testing, motivation, attention, concentration, and persistence were good[,] the testing is likely a realistic estimate of his intellectual and academic functioning," he "was cooperative[,] and the evaluation [was] likely valid." (R. 347-48).  Therefore, despite Dr. George's report that a diagnosis of borderline intelligence rather than mental retardation more accurately described Bush's overall intellectual abilities, the ALJ was not entitled to disregard Bush's valid IQ test scores

in determining whether he met the requirements of § 12.05(C). *Popp*, 779 F.2d at 1499 (holding that the claimant's IQ score of 69, if credible, "should be . . . used in applying Listing 12.05(C)"); *Lowery*, 979 F.2d at 837 (holding that an ALJ has no discretion to consider other evidence once the claimant presents a valid IQ score and satisfies the criteria of § 12.05(C)); *see also Siron*, 2014 WL 595287 at * 2 (holding that the ALJ erred in rejecting the claimant's IQ score because, "[u]nlike Popp, . . . [the claimant's] history completely lacks evidence" suggesting that the claimant attempted to manipulate her IQ score to present herself in an unfavorable light).

The Commissioner further argues that, under, *Popp*, the ALJ could theoretically have been justified in finding that Bush's scores were not credible in light of various objective findings of the psychologists (such as Dr. DeFrancisco's observation that Bush could spell the word "world" forward), Bush's past work history as a plasterer helper and farm worker, and his daily activities (which consisted mainly of watching television and feeding his chickens). *Cf. Popp*, 779 F.2d at 1499-1500 (holding that an IQ of 69 was not credible in light of the claimant's past work teaching high school algebra and present occupation as a college student nearing graduation with passing grades). The evidence cited by the Commissioner overwhelmingly fails to support the Commissioner's argument.[6] Moreover,

---

[6]In selecting those "facts" from the record most favorable to the Commissioner's argument that Bush exhibits sufficient intellectual capability to undermine the credibility of his IQ scores, the Commissioner failed to present a fully accurate picture of the evidence. For example, the Commissioner touts the fact that, during Dr. DeFrancisco's examination, Bush spelled the word "world" *forward* (Doc. 18 p. 10). However, Dr. DeFrancisco's note on this point is much less optimistic; in full, it reads as follows: "He could spell world forward but couldn't do it backwards. I don't think this was a concentration problem as it was just intellectual inability." (R. 288). As another example, the Commissioner argues that the ALJ would have

the ALJ did not discredit Bush's IQ scores on the basis of any of that evidence. The harmless error doctrine does not permit a reviewing court to usurp an administrative agency's function by engaging in a determination that "the agency alone is authorized to make and which it has not made;" instead, in such cases, "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 88 (1943); *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984) ("We decline . . . to affirm simply because some rationale might have supported the ALJ's conclusion. Such an approach would not advance the ends of reasoned decision making." (footnote and citation omitted)); *see also Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (holding that a reviewing court must not make findings of fact, reweigh the evidence, or substitute its judgment for that of the ALJ).

The ALJ also stated, without citing supporting evidence, that Bush did not have, in addition to the necessary IQ score in the 60-70 range, "a physical or other mental impairment

---

been justified in finding that Bush's IQ score was not credible in light of Dr. DeFrancisco's observation that Bush was able to remember two out of three objects after three minutes. (Doc. 18 p. 10). However, taken in context, Dr. DeFranciso's observations do not support a finding that Bush's memory of two out of three objects was an indication of intellectual capability. Rather, Dr. DeFrancisco's note reads: "He repeated three objects after me after a three minute interval remembered two of three. I thought this was most likely intelligence not poor memory. . . . Recent issues and problems with his memory I think are related to his IQ functioning rather than any kind of memory per say." (R. 288). The Commissioner states that, during his examination with Dr. George, Bush "knew the correct day of the month and year," (Doc. 18 p. 10), although Dr. George's note on this point more fully states that Bush "knew the correct day of the month and the correct year, but [incorrectly] identified the month as August." (R. 346). The majority of the material cited by the Commissioner from the record is presented in a similarly lopsided, incomplete, inaccurate, and unsubstantiated manner. The law "does not permit a court to uphold the [Commissioner]'s decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983)

15

imposing an additional and significant work-related limitation of function," as required by § 12.05(C).  (R. 34).  However, at step two of the sequential analysis, the ALJ expressly concluded at that Bush suffered a number of severe impairments other than intellectual disability.  (R. 33 ("The claimant has the following severe impairnents: . . .  chronic pain syndrome associated with a history of traumatic right ankle fusion and degenerative joint disease; right knee radiculopathy; lumbar radiculopathy; hypertension; chronic obstructive pulmonary disease . . . and arthritis.")).  The undisputed evidence supports the ALJ's step-two finding that Bush suffered severe physical impairments other than intellectual disability, and, in this court, the Commissioner does not contest that finding.  As a matter of law, for purposes of § 12.05(C), an impairment other than intellectual disability imposes "an additional and significant work-related limitation of function" if that impairment qualifies as a severe impairment at step two of the sequential evaluation.  20 CFR Pt. 404, Subpart P, app. 1 § 12.00(A); 65 Fed. Reg. 50746, 507754 (Aug. 21, 2000).  Therefore, as a matter of law, Bush does meet § 12.05(C)'s requirement of a physical or mental impairment (other than intellectual disability) imposing an additional and significant work-related limitation of function, and the ALJ did not properly follow the applicable regulations in finding otherwise.

The court notes that, to establish that a claimant meets the listing for intellectual disability under § 12.05(C), a claimant must also meet the requirements of the opening paragraph of §12.05, which states: "Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested

during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22."   20 C.F.R. 404, Subpt. P, App. 1, §§ 12.00(A), 12.05; *Lowery*, 979 F.2d at 836.  In this case, the ALJ expressly recognized the requirements of the opening paragraph of § 12.05, but did not discuss the evidence or set forth any findings relevant to those requirements.  Instead, recognizing that "[t]he required level of severity for" the impairment listed in § 12.05 "is met when the requirements in paragraphs A, B, C, or D are satisfied," the ALJ proceeded with her analysis and considered whether Bush met the requirements of paragraphs A, B, C, and D.  Because the ALJ proceeded with her analysis to consider whether Bush met the requirements of paragraphs A-D of § 12.05, it appears that the ALJ determined that Bush did have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested . . . before age 22." *Cf. Hutchinson v. Bowen*, 736 F.2d 1461, 1463 (11th Cir. 1986) (holding that "it is not required that the [ALJ] mechanically recite the evidence leading to her determination" as to whether the claimant's impairment meets the listings, but that "[t]here may be an implied finding" where the ALJ proceeds to subsequent steps of the sequential analysis).

Moreover, Bush presented valid IQ scores of 60-70, which creates a presumption that the disability onset occurred before the age of 22.  *Hodges v. Barnhart*, 276 F.3d 1265, 1268 (11th Cir. 2001) ("[A]bsent evidence of sudden trauma that can cause retardation, the IQ tests create a rebuttable presumption of a fairly constant IQ throughout [the claimant's] life.").  The Commissioner did not rebut this presumption, and there is no evidence of that Bush's intellectual disability was caused by sudden trauma after the age of 22.  Further, although

17

Bush was not required to present additional evidence of deficits in adaptive functioning before age 22, *Hodges*, 276 F.3d at 1266, the only evidence of his adaptive functioning before the age of 22 indicates that deficits did exist at that time. Specifically, although he attended school, he is functionally illiterate, and his school records reflect that he was enrolled in special education classes, made abysmal grades, was promoted from tenth to twelfth grade due to his age, and dropped out of school. (R. 241). *Cf. Lowery*, 979 F.2d at 835 (recognizing that a claimant's attendance in special education classes and evidence that the claimant read at a third grade level while in junior high were consistent with a longstanding deficit in intellectual performance).

Accordingly, the decision of the ALJ must be reversed because, in considering whether Bush had an impairment that met or medically equalled the listing for mental retardation found in § 12.05(C), the ALJ failed to follow the applicable regulations and did not base her findings on substantial evidence. *Walker*, 826 F.2d at 999. Further, because the uncontradicted evidence establishes that Bush does meet the requirements of § 12.05(C), the case will be remanded with instructions that benefits be awarded. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993) (recognizing that reversal with award of benefits is appropriate where the Commissioner "has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt"); *Ambers*, 736 F.2d at 1470 (holding that, if a claimant meets the listing in § 12.05(C), "the claimant is determined disabled" at that point in the sequential analysis, and further consideration is

18

unnecessary).

## V. Conclusion

Accordingly, this case will be reversed and remanded to the Commissioner and the case remanded to the Commissioner with instructions that benefits be awarded.  A separate judgment will be entered.

Further, it is

**ORDERED** that, in accordance with *Bergen v. Comm'r of Soc. Sec.*, 454 F.3d 1273, 1278 n.2 (11th Cir. 2006), the plaintiff shall have sixty (60) days after he receives notice of any amount of past due benefits awarded to seek attorney's fees under 42 U.S.C. § 406(b). *See also Blitch v. Astrue*, 261 Fed. Appx. 241, 242 n.1 (11th Cir. 2008).

The Court will enter a separate final judgment.

Done this 23rd day of May, 2014.

       /s/Charles S. Coody\
CHARLES S. COODY\
UNITED STATES MAGISTRATE JUDGE

19